IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WAYNE ROSENBERG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04 C 8219 |
| | ) | |
| CNA FINANCIAL CORP. and the | ) | |
| CNA SEVERANCE PAY PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

This lawsuit was brought by 90 individuals ("Plaintiffs") to recover severance benefits

allegedly owed them by their former employer, defendant CNA Financial Corporation ("CNA"),

under the terms of the defendant CNA Severance Pay Plan (the "Plan"). Plaintiffs' claims are

based on the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001,

*et seq.* ("ERISA") and federal common law. Before the court is Defendants' Motion for

Summary Judgement on Plaintiffs' pending claims. (Dkt. No. 126). For the reasons stated

below, Defendants' Motion is granted in part and denied in part. The court grants Defendants'

Motion for Summary Judgment as to Count IV (federal common law breach of contract), which

is dismissed with prejudice. The court denies Defendants' Motion as to Count I (wrongful denial

of benefits) and Count III (federal common law fraud), which remain in the case and will

proceed to trial unless the parties can reach a settlement.

<u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The court does not make credibility determinations or weigh conflicting evidence. *Abdullahi*, 423 F.3d at 773. However, summary judgment must be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

<u>BACKGROUND</u>

Plaintiffs are former employees of CNA who each worked for its Life Business Operations ("LBO") unit. Plaintiffs were employed by CNA as Life Sales Representatives ("LSRs"), selling life insurance, long-term care insurance, and annuities. In this capacity, Plaintiffs were classified as Class Code S Series sales employees. When CNA sold the LBO unit to reinsurance company Swiss Re in 2004, Plaintiffs' positions were eliminated and Plaintiffs were terminated on April 5, 2004. CNA later denied Plaintiffs' claims to severance benefits, and Plaintiffs filed this lawsuit.

The parties agree that two documents govern severance benefits for eligible CNA employees: (1) the CNA Severance Pay Plan (the "Plan") and (2) General Information about

Benefits at CNA ("Benefits at CNA" or "the Summary Plan Description").  It is also undisputed

that, in September, 2003, CNA amended the Plan to eliminate the eligibility of Class Code S

Series sales employees for severance benefits (the "Amendment").  Plaintiffs contend that they

were not provided reasonable notice of the Amendment, as required by the Summary Plan

Description ("SPD").  The SPD states, in relevant part:

> The plans described in *Benefits at CNA* have been established for the exclusive
> benefit of eligible Employees.  The Company reserves the right to amend, modify or
> terminate these plans including any benefits provided under these plans, or the
> amount of required contributions, at any time and for any reason.  All amendments
> will be made by action of the Company's Board of Directors or by the delegate of
> the Board of Directors.  *You will be notified of any material changes to these plans*
> *within a reasonable amount of time*.

(Def. Ex. 3, SPD at 7-8) (emphasis added).

1.      Notice of the Amendment and Communications Regarding the Plan

In August, 2003, Bob Keith (CNA Senior Vice President of Employee Relations)

approached Tom Pontarelli ("Pontarelli") (CNA Executive Vice President of Human Resources

and Corporate Services) with the suggestion that Pontarelli amend the Plan to exclude Class

Code S Series sales employees from coverage.  Pontarelli agreed with Keith's reasoning and

authorized the Amendment, effective September 1, 2003.

On the effective date of the Amendment, CNA updated the Plan on its intranet website

with the following relevant language, excluding Plaintiffs from coverage:

> You are eligible for severance benefits if you are a full-time CNA employee
> *(excluding sales employees in Class Code S Series)* or a part-time CNA  employee
> . . . who is involuntarily terminated due to a job elimination or reduction in force.

(Def. Ex. 2, Plan at 2) (emphasis added).  At the time, CNA did not highlight, underline, or draw

attention to the newly-added language in the intranet version of the Plan in any way, nor did

CNA contact Plaintiffs or otherwise alert them that there had been a change made to the Plan. All parties agree that CNA employees generally have access to the Plan and the SPD through the *Benefits at CNA* link on the CNA intranet website (known as "FOCUS").

In October and November, 2003, Senior Vice President of the Life Sales Office and Cross Market Development, Gary Burke ("Burke") hosted sales meetings in Hunt Valley, Maryland, and Orlando, Florida. Although the exact language employed by Burke at these meetings is unclear, it appears from the deposition testimony of numerous Plaintiffs that Burke assured LSRs that they would receive severance benefits if their employment were to be terminated as a result of a sale of the LBO unit.[1]

In November, 2003, CNA's President of Life and Group Operations, Robert McGinnis ("McGinnis"), sent a letter to certain CNA employees "to make you aware of some special considerations related to the CNA Severance Plan." (Def. Ex. 12, 11/12/03 Letter from McGinnis). McGinnis assured recipients of the letter that "there will be no material changes to the CNA Severance Plan that will impact current eligibility rules or benefit levels under that Plan" and that "[a]ll current CNA Severance Plan provisions will remain in effect." (*Id.*). McGinnis encouraged recipients to "stay focused on the good work we are doing," while recognizing his concern that "the noise around our company's earnings and the subsequent media speculation might become an increasing distraction to you." (*Id.*). This November 12, 2003 letter was sent to certain employees of the LBO unit at their home addresses, but was

---

[1] CNA does not dispute that "at certain conferences in the fall of 2003, there were conversations regarding the potential sale and/or severance benefits," but argues that "various plaintiffs contradicted others as to what actually was said at those conferences." (Def. Resp. to Pl. Statement Add'l Facts ¶ 14).

intentionally not sent to any LSRs.[2]

On February 5, 2004, McGinnis held a telephone conference call with all LBO employees. During the call, McGinnis announced the sale of the LBO unit and recognized that some employees would be terminated. The parties do not dispute that LSRs were included in the February 5, 2004 conference call with McGinnis. The parties do dispute whether the LSRs' participation was intended by CNA,[3] and whether McGinnis told conference call participants that all employees terminated as a result of the sale would receive severance benefits.

Also on February 5, 2004, after the conference call with McGinnis, Burke held a telephone conference call with just the LSRs. At that time, Burke told the LSRs that they would be terminated in 60 days and that they would not be receiving severance pay, due to an amendment to the Plan.

For a few days in mid-March, 2004, it is undisputed that the Human Resources Policy Manual posted on the CNA intranet website mistakenly omitted the exclusion of Class Code S Series sales employees from its severance benefits summary. This mistake was corrected by CNA, and the exclusion was subsequently reinserted into the Human Resources Policy Manual.

---

[2] Although the parties agree that LSRs "did not receive this letter," (Pl. Statement ¶ 11), the court notes that Defendants have directed the court to the deposition testimony of at least two Plaintiffs who remembered receiving the November 12, 2003 letter. (*See* Barlow Dep. 76:10-83:19; Walker Dep. 75:6-79:16). The court understands these Plaintiffs to have each been unintended recipients of the November 12, 2003 letter.

[3] McGinnis testified at his deposition that "I can tell you that all Life employees were supposed to be on [the call]. So if [LSRs] weren't on, they were – it would surprise me." (McGinnis Dep. 37:4-6). Plaintiff Stephen Young testified that "Now, somehow [McGinnis] found out that there were life sales reps on the call. This was I think a technical snafu on CNA's end, sounded awfully darn panicked and ended that call in a hurry." (Young Dep. 48:5-8).

On March 31, 2004, CNA posted a Summary of Material Modifications ("SMM") on its benefits intranet website. (*See* Def. Ex. 18). The posting included a call-out under "Compensation & Benefits News" (alerting viewers that the SMM was being mailed to their homes) and a link entitled "Review Recent Changes Made to Benefits at CNA." (*Id.*). Viewers who clicked the link were led to a posting reiterating that the SMM was being delivered through the mail and directing viewers to visit the *Benefits at CNA* webpage if they wished to view the SMM. The *Benefits at CNA* webpage included a link to the SMM, describing the SMM as a document that "outlines the important changes made to CNA's employee welfare benefit plans, the CNA Retirement Plan, and the CNA Savings and Capital Accumulation Plan in 2003 and 2004." (*Id.*).

The 2-page SMM document addressed changes to a number of CNA plans and noted that it should be considered part of the Summary Plan Description. (Def. Ex. 19). In a separate paragraph entitled "CNA Severance Pay Plan," the SMM read, "Effective September 1, 2003, sales employees in Class Code S series are not eligible to receive benefits from the CNA Severance Pay Plan." (*Id.*). On March 31, 2004, a copy of the SMM was sent to Plaintiffs at their homes via overnight mail delivery. The SMM was sent to all other employees' homes by regular mail.

As stated above, Plaintiffs were each terminated from employment with CNA on April 5, 2004.

2.      Procedural History

On December 21, 2004, Plaintiffs filed a four-count complaint asserting (1) a claim for benefits due under ERISA § 502(a)(1)(B); (2) breach of fiduciary duty under ERISA §§ 404,

502(a)(2) and 502(a)(3); (3) fraud based on federal common law and ERISA § 502(a)(3); and (4) breach of contract under federal common law and ERISA § 502(a)(3).

On July 22, 2005, then presiding Judge Manning[4] declined to dismiss Count I, noting that the caselaw relied upon by CNA did not rule out the possibility that "defendants could be responsible for abiding by a notification date imposed by the Plan separate and apart from the notification requirements under ERISA." (Dkt. No. 41 at 5). Judge Manning also found that Plaintiffs had abandoned their claim for relief under ERISA § 502(a)(2), and that "plaintiffs' requests for relief under Counts II, III, and IV pursuant to ERISA section 502(a)(3) are barred because plaintiffs have a claim available to them under 502(a)(1)(B)." (Dkt. No. 41 at 10) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)). Judge Manning further found that Plaintiffs' claim for federal common law fraud was plead with sufficient specificity under Federal Rule of Civil Procedure 9(b), and that CNA's remaining contentions were best addressed in a motion for summary judgment.[5]

In a separate Memorandum and Order on September 7, 2005, addressing the proper scope of discovery in this case, Judge Manning determined that "plaintiffs have raised claims above and beyond a claim of entitlement to benefits," noting that "the Seventh Circuit has expressly

---

[4] This case was reassigned to Judge Kendall on January 23, 2006 (Dkt. No. 77) and then, upon her recusal, to Judge Holderman on June 30, 2006 (Dkt. No. 94).

[5] In her July 22, 2005 ruling, Judge Manning did not specifically address ERISA § 404. The court's order did state, however, that "the court dismisses all of Count II." (Dkt. No. 41 at 12). Confusingly, the court's order of September 9, 2004, then went on to state that "a claim of breach of fiduciary duty under ERISA § 404 against CNA (Count II)" was among those that had "survived" the motion to dismiss. (Dkt. No. 55 at 2). Because the parties do not argue that a separate claim for violations of ERISA § 404 survived the motion to dismiss, the court hereby determines that all of Count II has, indeed, been dismissed.

recognized that a plaintiff may bring a federal common law fraud claim separate and apart from a claim based on a breach of fiduciary duty under ERISA."  (Dkt. No. 55 at 2) (citing *Beach v. Commonwealth Edison Co.*, 382 F.3d 656, 659 (7th Cir. 2004)).

ANALYSIS

1.      Count I – Benefits Under ERISA § 502(a)(1)(B)

ERISA explicitly empowers plan participants to file civil actions to recover benefits owed and to enforce or clarify their rights under the terms of the plan.  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs originally argued to CNA that they were entitled to severance benefits on the grounds that they were not given notice of the Amendment "within a reasonable amount of time," as promised in the Summary Plan Description.  (SPD at 8).  CNA rejected Plaintiffs' claims in a two-step appeals process, finding that the notice given was reasonable under both the terms of the Plan and the disclosure requirements of ERISA.

A.      Standard of Review

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In other words, a court's review of the plan administrator's decisions may be limited.  *See Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 637 (7th Cir. 2005) ("If a plan wishes to insulate its decision to deny benefits from plenary review, the surest way to do so (at least in this Circuit) is by including language that either mimics or is functionally equivalent to the 'safe harbor' language we have suggested.") (citing *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir.

8

2000)).

In *Herzberger*, the Seventh Circuit addressed the exact language needed to confer sufficient discretion upon the plan administrator, so as to result in a deferential standard of judicial review. The *Herzberger* court concluded "if the employer is going to reserve a broad, unchanneled discretion to deny claims, the employees should be told about this, and told clearly." *Id.* at 333. The court set forth an example of "safe harbor" language guaranteed to confer judicial deference to administrative decisions, but at the same time also emphasized that alternative language can "indicate[ ] with the requisite if minimum clarity that a discretionary determination is envisaged." *Id.* at 331. Where the plan administrator has been clearly granted broad discretion, the "arbitrary and capricious" standard of review applies to the plan administrator's decisions. *Militello v. Central States, S.E. & S.W. Areas Pension Fund*, 360 F.3d 681, 685-86 (7th Cir. 2004).

In this case, the CNA Severance Pay Plan states:

> The CNA Severance Pay Plan is administered by a Plan Administrator. The Plan Administrator has full discretion to construe and interpret all benefit plans, as well as the authority and responsibility to make all factual and legal determinations. The decisions of the Plan Administrator are final, conclusive, and binding.

(Plan at 5). Additionally, the language of the Summary Plan Description directly mimics the "safe harbor" language provided by the Seventh Circuit in *Herzberger*, with a few minor changes:

> The Plan Administrator has the discretionary authority to determine eligibility for benefits and to interpret the terms of all the plans. Benefits under the plans will be paid only if the Plan Administrator decides in its discretion that the applicant is entitled to them.

(SPD at 6-7); *see Herzberger*, 205 F.3d at 331 ("Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them."). Plaintiffs do

not dispute that the plain language of the Plan and the SPD calls for deferential judicial review.

Plaintiffs do argue, however, that the court's level of deference must be applied on a "sliding scale," because the Plan Administrator in this case had a conflict of interest. (Dkt. No. 143 at 9) (quoting *Manny v. Cent. States, S.E. & S.W. Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 242-43 (7th Cir. 2004)). As the Supreme Court has recognized, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). Courts are to "presume neutrality unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 575 (7th Cir. 2006) (citations omitted). A "merely notional conflict of interest" will not suffice to heighten the scrutiny of the court. *Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772, 776-77 (7th Cir. 2006).

To answer the question of whether the Plan Administrator in this case was operating under a conflict of interest, this court must first identify the Plan Administrator. The SPD presents CNA Financial Corporation as the "Plan Administrator" "[f]or legal purposes." (SPD at 6). However, the SPD also states that "[a]n individual known as the Plan Administrator has been appointed to administer each of the plans on [CNA's] behalf." (*Id.*). In this case, Donna Kolodziej (now Donna Bonatz ("Bonatz")), Director of Human Resources, acted as the individual Plan Administrator at all relevant times. (*See* Def. Ex. 28, Denial Letter of 5/21/2004 at 5) (signed by Bonatz "on behalf of the Plan Administrator"). This is consistent with CNA's position that it is empowered to designate agents to act on its behalf as "Plan Administrator."

(*See* Def. Statement ¶ 16).  However, employees are also granted leave to appeal the individual

Plan Administrator's denial of benefits to the CNA Operations Committee, and the Plan clearly

states that "[d]ecisions of the Operations Committee are final."  (Plan at 6).  It therefore appears

that the Operations Committee was also operating on behalf of CNA in its capacity as "Plan

Administrator."

Plaintiffs argue that the Operations Committee's review is "immaterial" because the

Operations Committee was not granted discretionary authority to hear Plaintiffs' appeals.  (Dkt.

No. 143 at 8 n.1).  Plaintiffs do not cite to any evidence in the record indicating that the

Operations Committee's decision was not discretionary, and the court is unaware of any

evidence that the Operations Committee's decision relied upon or otherwise deferred to Bonatz's

earlier conclusion.  In fact, the Operations Committee Record of Decision (Def. Ex. 33) and the

Second Level Appeal Denial Letter of September 24, 2004 (Def. Ex. 34) both indicate that the

Operations Committee considered Plaintiffs' arguments *de novo*.  As stated above, CNA was

empowered to identify agents to act on its behalf as Plan Administrator.  Acting in this capacity,

both Bonatz and the Operations Committee exercised the same level of discretion as that

afforded to the Plan Administrator.  Because the Operations Committee was responsible for

issuing a final decision on behalf of the Plan Administrator, the court must determine whether

there is evidence of actual bias on the part of the Operations Committee members.

The Operations Committee consisted of Pontarelli, Lori Komstadius ("Komstadius")

(Executive Vice President of Human Resources), and Wendy Lynn ("Lynn") (Vice President of

Benefits Consulting).  Plaintiffs originally argued that Bonatz was biased, due to her

involvement in posting the Amendment to the intranet.  (Dkt. No. 143 at 7; Pl. Statement ¶ 8).  In

response to this argument, CNA has asserted that it was actually Pontarelli who directed Bonatz to make the change in the Plan documents in September, 2003. (Dkt. No. 151 at 2; Def. Response ¶ 8). The undisputed evidence in the record supports the assertion that Pontarelli was responsible for approving the Amendment, while Bonatz actually implemented the change. However, the court is unaware of any evidence that Pontarelli was involved in any decision not to initiate additional notice of the Amendment at that time.

On the other hand, the court should not overlook evidence in the record that other members of the Operations Committee may have possibly harbored bias, as well. For example, the record indicates that Komstadius and Lynn were both at least partially responsible for the decision to send out the Summary of Material Modifications on March 31, 2004. (*See* Pl Statement ¶ 17; Lynn Dep. at 129; Komstadius Dep. at 55-56).

The essential question before the Operations Committee when considering the matter was whether CNA supplied reasonable notice of the Amendment to the LSRs. Generally, when addressing the denial of plan benefits, "[c]orporations act through agents, and these agents usually lack any stake in the outcome." *Perlman v. Swiss Bank Corp*, 195 F.3d 975, 981 (7th Cir. 1999). In this case, however, Komstadius and Lynn appear to have sat in judgment of their own decision to send out the March 31, 2004 SMM notice. If the Operations Committee had determined that CNA's notice on March 31, 2004 was *not* reasonable, CNA may have been on the hook for $4,850,000 in severance benefits. With a decision of this magnitude before them, it might have been difficult for Komstadius and Lynn to approach Plaintiffs' claims objectively. *Compare Perlman*, 195 F.3d at 981 (finding no bias, in part because "the award in any one case will have only a trivial effect on [a large corporation's] operating results") *with Van Boxel v.*

*Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1051 (7th Cir. 1987) ("if the denial of an application is on grounds disqualifying a vast number of applicants . . . any presumption of neutrality may fail"). Furthermore, a decision by the Operations Committee to grant Plaintiffs' claims could have had an adverse impact on Komstadius' and Lynn's employment, if the Operations Committee concluded that it was unreasonable to send the March 31, 2004 notice in the time and manner in which it was sent. Because the court finds that the Operations Committee was acting under a potential conflict of interest, the court will employ "careful judicial scrutiny to make sure [the Operations Committee's] action was reasonable." *Van Boxel*, 836 F.2d at 1053. Although this type of review is "slightly more penetrating," "the pertinent question remains whether [the Operations Committee's] decision was arbitrary and capricious." *Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 659-60 (7th Cir. 2005).

B.      The Operations Committee's Denial of Plaintiffs' Claims

Plans affording severance benefits to employees are viewed as welfare plans under ERISA, rather than pension plans. *See* 29 U.S.C. § 1002(l); *Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1045 (7th Cir. 1988). As a general matter, welfare plans can be amended by the employer for any reason and at any time. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). An employer choosing to make a material modification to its welfare plan is obligated, however, to notify plan participants of the change within 210 days of the end of the year in which the change was adopted. ERISA § 104(b), 29 U.S.C. § 1024(b); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 978 (7th Cir. 1999). In this case, the parties agree that CNA provided notice of the amendment within 210 days of the end of 2003, the year in which the Amendment was adopted.

However, CNA also included its own notice provision as part of the Plan documents. According to its terms, the SPD specifically states that employees "will be notified of any material changes to [the Plan] within a reasonable amount of time." (SPD at 8). In other words, by the terms of the SPD, CNA qualified its own "right to amend, modify or terminate these plans . . . at any time and for any reason." (SPD at 7). Plaintiffs' argue that CNA failed to provide "reasonable" notice of its decision to exclude LSRs from the Severance Pay Plan, thus violating Plaintiffs' rights pursuant to the terms of the SPD.

In its denial letter of September 24, 2004, the Operations Committee set forth its conclusion that "several communications" on the part of CNA "constitute[d] notice that satisfies both the 'reasonableness' requirements of the Plan and the disclosure requirements of ERISA." (Def. Ex. 34 at 2). These communications included the September 1, 2003 posting of the revised Plan documents on the CNA intranet, the February 5, 2004 telephone conference call in which Burke informed LSRs that they were not eligible for severance benefits, and the March 31, 2004 SMM mailing and posting on the CNA intranet. The Operations Committee determined that there was no requirement under ERISA to notify Plaintiffs of the Amendment either before it became effective, or within 90 days of the effective date.

The Operations Committee recognized that, from March 15, 2004 through March 17, 2004, the Human Resources Policy Manual did mistakenly indicate that LSRs were eligible for severance benefits; however, the Operations Committee also noted that the Human Resources Policy Manual was not an official Plan document. The Operations Committee also briefly addressed Plaintiffs' contention that McGinnis had misled them through the statements in his

November 12, 2003 letter and at the February 5, 2004 conference call.[6]  The Operations

Committee concluded that the November 12, 2003 letter had not been sent to any LSRs and

emphasized that the SPD specifically states, "**Important Note:**  No representative of the

Company has the authority to make any agreement contrary to the provisions of any CNA

employee benefits plan."  (SPD at 3).

It is undisputed that the Plan documents do not define the term "reasonable" in

connection with notification to employees of material changes to the plans.  Nor do the Plan

documents suggest any particular understanding between the parties as to the meaning.  In its

decision, the Operations Committee identified the various steps taken by CNA regarding the

Amendment, but the Operations Committee did not explain *why* these steps should be considered

reasonable.  In other words, although empowered to do so, the Operations Committee failed to

define "a reasonable amount of time" or to identify what type of notification was required under

the Plan.  In the denial letter of September 24, 2004, there was no discussion of the timeliness or

adequacy of CNA's actions.  Instead, the Operations Committee merely stated its conclusion that

the actions taken by CNA satisfied the reasonableness requirement of the Plan.  Because the risk

of an arbitrary decision under the circumstances reflected in the record before the court is

uncomfortably high, the court declines to defer to the Operations Committee's conclusion.

Instead, the court will turn to the parties' arguments to assess whether "it is possible to offer a

reasoned explanation, based on the evidence, for [the Operations Committee's conclusion]."

---

[6] The September 24, 2004 denial letter also referred to Plaintiffs' claim that McGinnis
had sent a misleading email in November, 2003.  The Operations Committee stated that it had no
record of such an email, and the parties have not discussed this alleged email in their briefings
before the court.

*Militello*, 360 F.3d at 686.  If so, the Operations Committee's decision will not be overturned.

*Id.*

C.      Notification "Within A Reasonable Amount of Time"

Defendants argue that Plaintiffs had actual notice of the Amendment within the 210-day timeframe set forth by ERISA § 104(b), 29 U.S.C. § 1024(b), and that such notice must therefore be considered "reasonable."  In other words, Defendants argue that the promise to notify participants of material changes to the Plan "within a reasonable amount of time" is best understood to coincide with ERISA's notice requirement.  Defendants further argue that the court is barred from applying general principles of contract law to ERISA plans, regardless of the language employed in the Plan itself.  (Dkt. No. 151 at 4).  The court is not fully persuaded by Defendants' argument.  While ERISA certainly preempts causes of action brought under state law breach of contract, general principles of contract interpretation still apply to specific terms and provisions of benefits plans.  *Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (noting that "federal principles of contract construction apply" to the interpretation of welfare benefit plans).  Pursuant to federal principles of contract construction, this court should give effect to all provisions in the Plan documents and read all related documents together as a whole.  *Id.*  As Plaintiffs have noted, the Defendant's interpretation of the "reasonable notice" clause "effectively read[s] the timeliness term out of the Plan."  (Dkt. No. 143 at 11).  This interpretation does not give effect to CNA's stated qualification on its own reservation of rights – that, in the event CNA were to make a material change to the Plan, employees will be notified of such change "within a reasonable amount of time."  Defendants do not offer an alternative interpretation of the notice provision.

Plaintiffs assert that the court must instead consider the substance and timing of the notice provided in order to determine whether CNA provided Plaintiffs with "meaningful" notice. Plaintiffs assert that notice should be considered reasonable if it grants the recipient sufficient time to make alternative arrangements. (Dkt. No. 143 at 10-11) (directing the court to bankruptcy law and the Illinois Uniform Commercial Code in support of this proposition). Plaintiffs also rely on the Department of Labor regulations governing certain ERISA disclosures in support of the argument that notice must be "reasonably calculated to ensure actual receipt of the material by plan participants" and that "in no case is it acceptable merely to place copies of the material in a location frequented by participants." (Dkt. No. 143 at 11) (citing 29 C.F.R. § 2520.104b-1(b)(1)). Finally, Plaintiffs argue that "reasonable" notification is best viewed in light of CNA's customary notification practices and its employees' expectations in this regard.

As discussed above, the Plan fails to specifically define the type, substance, or adequacy of the required notification. Though ERISA default provisions may not be conclusive on the question of a "reasonable" timeframe, the court believes that these provisions can define the type of notice that should be expected by plan participants. Under ERISA's disclosure requirements for welfare benefit plans, ERISA § 104(b), plan administrators are required to furnish a summary description of any material modification or change to a welfare plan to each participant. The Department of Labor guidelines regulating other notice provisions of ERISA state that "the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants [but that] in no case is it acceptable merely to place copies of the material in a location frequented by participants." 29 C.F.R. § 2520.104b-1(b)(1). Defendants argue that electronic distribution has been allowed under other relevant guidelines regulating the

distribution of benefit plan information.  *See* 26 C.F.R. § 1.401(a)-21(a)(5)(ii).  While this is generally correct, these guidelines also specifically require that "[t]he electronic system must be designed to alert the recipient, at the time an applicable notice is provided, to the significance of the information in the notice (including identification of the subject matter of the notice)."  26 C.F.R. § 1.401(a)-21(a)(5)(ii).

Under these standards, the September 1, 2003 posting to the CNA intranet cannot be considered "reasonable" notice.  It was not accompanied by any alert, as required by 26 C.F.R. § 1.401(a)-21(a)(5)(ii), nor was it "reasonably calculated to ensure actual receipt of the material by plan participants," as required by 29 C.F.R. § 2520.104b-1(b)(1).  Instead, by posting the notice on the intranet, Defendants appear to have merely "place[d] copies of the material in a location frequented by participants."  29 C.F.R. § 2520.104b-1(b)(1).  This does not qualify as effective notification under ERISA's guidelines, and the court does not consider it to have been reasonable in accordance with the legitimate expectations of the Plan's participants.

Likewise, any notice provided by Burke in the February 5, 2004 conference call was again not "reasonably calculated to ensure actual receipt of the material by plan participants."  29 C.F.R. § 2520.104b-1(b)(1).  Although Burke's statements put Plaintiffs on notice that the Plan had been amended, CNA did not provide Plaintiffs with these material changes in writing.  CNA may have assumed that Plaintiffs would have accessed the intranet in light of Burke's comments and thus "received" the amended Plan materials, but such an assumption falls short of any affirmative conduct to ensure that Plaintiffs would take this step and thus acquire a copy of the relevant material changes.  Pursuant to ERISA guidelines, Burke's statements do not constitue sufficient notice of a Plan modification.

CNA did provide adequate notice – both electronically and in hard copy – on March 31, 2004. However, the timing of this notice was inadequate. Defendants are correct that ERISA provisions did not require them to disclose the Amendment at any point before Plaintiffs' termination. However, CNA promised its employees something more – notice of any material changes "within a reasonable amount of time." When interpreting the terms of an ERISA welfare benefit plan, "Plan language should be read 'in an ordinary and popular sense,' construed as if by a 'person of average intelligence and experience.'" *Bland*, 401 F.3d at 784. By any objective understanding of CNA's promise to timely notify its employees of material changes to their benefits plans, it was unreasonable for CNA to knowingly wait to tell Plaintiffs of the Amendment disqualifying them from severance benefits until almost seven months after the Amendment took effect, and four days before each was terminated from employment.

The court finds that CNA did not at any point in time provide sufficient notice of the Amendment in a timely manner, such as would constitute the timely notification of material changes promised by CNA in its Plan documents. Because the court finds no reasoned explanation for the Operations Committee's conclusion, the decision of the Operations Committee is overruled.

D.    Recovery of Benefits

As a general matter, a violation of ERISA's notice provisions does not always, or necessarily, result in the vesting of welfare benefits. *See Panaras v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 789 (7th Cir. 1996) (calling this a "technical" violation). However, there is an exception to this bar on recovery for situations in which the employer "acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their [sic] employees by inducing

their reliance on a faulty plan summary." *Id.* (quoting *Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739, 743 (7th Cir. 1991)).

In this case, it is undisputed that in November, 2003, CNA took specific steps to clarify the severance benefits of certain LBO employees, while remaining silent as to the LSRs' termination of severance benefits. (*See* 11/12/03 Letter from McGinnis). Likewise, there is disputed evidence in the record as to whether Burke falsely (and knowingly) assured LSRs in different meetings during the fall of 2003 that their severance benefits remained intact. Defendants admit that, by November 4, 2003, CNA was aware that Swiss Re was a potential purchaser of the LBO unit. (Def. Statement ¶ 43). Based on this evidence, the court finds that there is a disputed question of fact as to whether CNA intentionally made false representations to LSRs regarding the status of their severance benefits.

Because Plaintiffs could potentially prove that CNA proceeded in bad faith when it violated the notice requirements of the Plan documents, the court denies Defendants' Motion for Summary Judgment as to Count I.

2.      Count III – Federal Common Law Fraud

In thier Motion for Summary Judgment, Defendants also seek the dismissal of Count III of Plaintiffs' Complaint, based on federal common law fraud.

A.      Common Law Fraud Cause of Action

Defendants argue that the Seventh Circuit has never adopted a federal common law fraud cause of action in ERISA cases. However, the Seventh Circuit has stated in dicta that federal common law does supply a cause of action for fraud in the ERISA context. *See Beach v. Commonwealth Edison Co.*, 382 F.3d 656, 659 (7th Cir. 2004) ("Doubtless federal common law

prohibits fraud with respect to pension and welfare benefits, apart from any need to invoke ERISA's fiduciary duty. ERISA preempts state law relating to pension plans, and federal courts regularly create federal common law (based on contract and trust law) to fill the gap.") (internal citations omitted). In her Memorandum and Order of September 7, 2005, Judge Manning relied on this dicta from the Seventh Circuit, finding that Plaintiffs had successfully stated a cause of action for fraud under the federal common law. (Dkt. No. 55 at 2-3).

Under the law of the case doctrine, a district judge may reconsider a previous ruling in the same case if "there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006). In other words, a court should only revisit prior decisions in "extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, n.8 (1983)).

Defendants have directed the court to no controlling case law indicating that Judge Manning's decision was clearly erroneous. Defendants' main argument is that "Plaintiffs' fraud claim is nothing more than a disguised benefits claim." (Dkt. No. 129-2 at 12). In *Varity*, the Supreme Court noted that the fashioning of equitable relief is not appropriate if "Congress elsewhere provided adequate relief for a beneficiary's injury." *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). Thus, the Seventh Circuit has recognized that an action for breach of fiduciary duty under ERISA should not be employed "to litigate 'ordinary benefit claims.'" *Herman v. Cent. States*, 423 F.3d 684, 695 (7th Cir. 2005) (quoting *Varity*, 516 U.S. at 514-15). Following this reasoning, it would seem that the court should not allow a federal common law fraud cause

21

of action in situations where ERISA provides an adequate remedy for the injuries caused by Defendants' alleged fraud. In this case, however, the general disclosure provisions of ERISA do *not* function to protect employees in Plaintiffs' position from losing their severance benefits, as discussed above. The Seventh Circuit has suggested that a federal common law cause of action for fraud can exist side-by-side with ERISA's provisions. Since it was not clearly erroneous for Judge Manning to follow the Seventh Circuit's lead on this point of law, the court denies Defendants' request for summary judgment on these grounds and will evaluate the facts and the law at the trial, unless the parties reach a settlement.

B.      Exhaustion of Administrative Remedies

        The Seventh Circuit has consistently noted that a district court "may properly require exhaustion of administrative proceedings prior to the filing of a claim involving an alleged violation of an ERISA statutory provision." *Powell v. A.T. & T. Communications, Inc.*, 938 F.2d 823, 826 (7th Cir. 1991). On the other hand, Plaintiffs' cause of action may not require administrative review, because it is based on federal common law fraud rather than a review of the denial of benefits. *See Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005). In this case, Plaintiffs did not specifically argue their federal common law fraud claim during the administrative proceedings before the Operations Committee. However, Plaintiffs did argue that CNA "knowingly made misleading statements regarding its severance plan designed to keep all employees, including LSR's, on board and producing business for CNA." (Def. Ex. 30 at 6). Plaintiffs directed the Operations Committee to the November 12, 2003 letter from McGinnis, the October, 2003 and November, 2003 statements by Burke at the regional sales conferences, and the February 5, 2004 statements by McGinnis during the conference call.

Because these elements and allegations form the essence of Plaintiffs' fraud claim, the court finds that Plaintiffs have effectively exhausted their administrative remedies in regards to their federal common law fraud claim.

C.    Elements of Federal Common Law Fraud

At the minimum, "[f]raud requires knowledge of the truth and an intent to conceal or mislead." *Beach*, 382 F.3d at 659. As discussed above, it is a disputed question of fact in this case whether CNA intentionally engaged in misleading conduct regarding the Amendment excluding Plaintiffs from receiving severance benefits under the Plan. Because the basic elements of federal common law fraud are disputed in this case, the court denies Defendants' Motion for Summary Judgment on Count III, Plaintiffs' federal common law fraud claim.

3.    Count IV – Federal Common Law Breach of Contract

In Count IV of their Complaint, Plaintiffs allege that the Plan is a unilateral contract and that Defendants breached this contract by failing to pay Plaintiffs the "fixed and unalterable" benefits Plaintiffs earned as a result of performing under the Plan. (Compl. ¶¶ 29-31). Generally, any provision purporting to vest welfare benefits must be expressed in a written contract "as set forth in the benefit plan documents." *See Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 783 (7th Cir. 2005); *see also Vallone v. CNA Financial Corp.*, 375 F.3d 623, 632 (7th Cir. 2004) ("a modification that purports to vest welfare benefits must be contained in the plan documents and must be stated in clear and express language"). Additionally, an employer's intention to vest welfare benefits must be expressed in "clear and express" language. *Bland*, 401 F.3d at 784.

In their responsive briefing before the court, Plaintiffs now point to a March 8, 2000 letter from then division President Peter Jokiel to all LBO employees as the basis of their alleged unilateral contract for severance benefits. (Pl. Ex. 2). The March 8, 2000 letter announced that CNA was "exploring the sale of the CNA Life businesses," and the Q & A section attached to the letter stated as follows:

> 10.    If these businesses are sold, and this results in job eliminations, will impacted employees be eligible for severance and outplacement assistance?
>
>     Again, this is an exploratory process which may not result in a sale. If the businesses are sold, the buyer could elect to retain all employees. However, if any positions are eliminated as a result of a sale, employees would be eligible for enhanced severance and outplacement assistance, subject to CNA's policies.

(March 8, 2000 letter at 1, 4).

At the outset, the court notes that, because this letter was not a part of the Plan documents, it cannot form the basis of Plaintiffs' allegedly vested severance benefits. Furthermore, the language of the letter does not clearly express an intent to vest Plaintiffs' severance benefits for an unlimited amount of time. The letter states that "this is an exploratory process which may not result in a sale," and it is clear that any promise of severance benefits was related to the anticipated upcoming sale of the LBO unit, which the parties agree did not occur at that time. (*See* Pl. Statement ¶ 4). Finally, the letter also states that the promise of enhanced severance is "subject to CNA's policies." CNA's Plan and SPD include multiple express reservation-of-rights provisions. *See* Def. Statement ¶¶ 19-21. Where there is a tension between promises of benefits and a reservation of rights, the court must give meaning to both provisions, such that "although the plan in its current iteration entitles [plaintiffs to certain benefits], the terms of the plan – including the plan's continued existence – are subject to change at the will of

[the employer]." *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003). Because the March 8, 2000 letter does not give rise to vested severance benefits, it cannot form the basis of Plaintiffs' federal common law breach of contract claim.

Defendants cite to *Vallone*, 375 F.3d at 638-39, for the proposition that the Seventh Circuit does not recognize a federal common law breach of contract claim under ERISA. The court in *Vallone* noted that the plaintiffs' claims for breach of ERISA contract were "duplicative" of their claims for wrongful denial of benefits under ERISA § 502(a)(1)(B), and stated in dicta that "claims by a beneficiary for wrongful denial of benefits (no matter how they are styled) have been held by the Supreme Court to 'fall [ ] directly under § 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes.'" *Vallone*, 375 F.3d at 638-49 (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62-63 (1987)). Because the court finds that Plaintiffs have failed to demonstrate that their rights vested under the terms of the March 8, 2000 letter, the court need not decide at this time whether the Seventh Circuit would recognize a claim for federal common law breach of contract under these circumstances.

Defendants' Motion for Summary Judgement as to Plaintiffs' federal common law breach of contract claim is granted. Count IV is dismissed with prejudice.

4.    Plaintiffs' Breach of Fiduciary Duty Claim

Finally, Plaintiffs ask the court to reconsider Judge Manning's dismissal of their breach of fiduciary duty claim. In support of their request, Plaintiffs argue that they "have now uncovered evidence that defendants through their wrongful concealment of the severance plan amendment profited to the extent of $30 million plus." (Dkt. No. 143 a 18). Plaintiffs cite to

25

*Marseilles Hydro Power LLC v. Marseilles Land & Water Co.*, 481 F.3d 1002, 1004 (7th Cir. 2007), for the proposition that a court should decline to overturn an earlier decision in the same case "unless it is manifestly erroneous *or there have been new factual developments*." (Dkt. No. 143 at 17) (emphasis added). The *Marseilles* case does not address the question of new factual developments, nor does *Starcon Int'l, Inc. v. Int'l Bortherhood of Boilermakers*, 450 F.3d 276, 278 (7th Cir. 2006)), the case on which *Marseilles* relies. Rather, both cases state that the earlier decision should only be overturned if it was manifestly erroneous.

Plaintiffs have not convinced this court that Judge Manning's decision was manifestly erroneous at the time it was made. In her July 22, 2005 Memorandum and Order, Judge Manning specifically noted Plaintiffs' failure to contend "that the relief under 502(a)(1)(B) is inadequate." (Dkt. No. 41 at 12). Although Plaintiffs had the opportunity to argue before Judge Manning that they were entitled to the disgorgement of any profits resulting from CNA's breach of its fiduciary duty, Plaintiffs did not do so. There is no reason to believe Plaintiffs could not have made this allegation or relied upon this argument when this issue was properly before Judge Manning. Plaintiffs' attempt to raise the issue at this point in the case is untimely, and Plaintiffs' request to reinstate their breach of fiduciary duty claim is therefore denied.

CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted as to Count IV (federal common law breach of contract), which is dismissed with prejudice, and denied as to Count I (wrongful denial of benefits) and Count III (federal common law fraud), which remain for trial. The parties are strongly urged to discuss settlement. All previously set dates remain in effect.

ENTER:

_James F. Holderman_
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: July 23, 2007